Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 5209 | **DATE** | 7/30/2001 |
| **CASE TITLE** | Siegfried Herrnreiter vs. Chicago Housing Authority | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Chicago Housing Authority's motion for summary judgment (Doc. No. 73-1) is granted on Counts I-IV.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | **3** | **Document Number** |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | JUL 3 1 2001 | |
| | Notified counsel by telephone. | | date docketed | 92 |
| | Docketing to mail notices. | | CM | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 7/30/2001 | |
| ETV | courtroom deputy's initials | FD-7 FILED FOR DOCKETING 01 JUL 30 PM 5: 08 | date mailed notice | |
| | | Date/time received in central Clerk's Office | ETV mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SIEGFRIED HERRNREITER,        )
                              )
            Plaintiff,        )
                              )
     v.                       )        No. 98 C 5209
                              )
CHICAGO HOUSING AUTHORITY,    )        Judge Rebecca R. Pallmeyer
                              )
            Defendant.        )

## MEMORANDUM OPINION AND ORDER

Plaintiff Siegfried Herrnreiter ("Herrnreiter"), a naturalized U.S. citizen of German national origin, was employed as an auditor by Defendant Chicago Housing Authority ("CHA") until his unsatisfactory work performance resulted in his discharge in 1996. Herrnreiter has filed this action against CHA under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, *et seq.* His complaint as amended consists of four counts: Count I is a claim for harassment based on his national origin; Count II is a claim for racial discrimination; Count III is a claim for national origin discrimination; and Count IV is a claim for retaliation. CHA now moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, CHA's motion is granted.

## FACTS

Plaintiff has a bachelor's degree in accounting and is a certified public accountant and a certified internal auditor. (Defendant's Rule 56.1(a)(3) Statement (hereinafter "Def.'s 56.1 St.") ¶ 6.) He began his employment as a Senior Auditor in

the CHA's Office of the Inspector General (hereinafter "OIG") on April 20, 1992. (*Id.* ¶¶ 7,8.) The OIG consists of two departments, auditing and investigations. (*Id.* ¶ 9.) These departments are responsible for analyzing and investigating possible incidents of fraud, waste, and abuse within the CHA. (*Id.*) Altogether, in 1996, the OIG employed five investigators and three auditors. (Defendant's Rule 56.1(A) Reply to Plaintiff's Statement of Additional Facts (hereinafter "Def.'s 56.1 Reply") ¶¶ 1-2.)

Plaintiff presents no evidence of friction in the first few years of his employment, but he complains that by 1995 he began to suffer harassment on the basis of his race and national origin. In support of this claim, Plaintiff points, first, to an incident that occurred on April 7, 1995, when Abel Turrubiartes, OIG's Chief Auditor, was speaking with a staff auditor, Virma Rodriguez, a woman of Filipino heritage. (Def.'s 56.1 St. ¶ 19.) While Plaintiff did not personally witness the conversation, he claims that Rodriguez told him that Turrubiartes referred to naturalized citizens as foreigners and told Rodriguez that he did not want to hire them because he did not want to end up "with another Siegfried [Herrnreiter] or Virma [Rodriguez]." (Plaintiff's Deposition (hereinafter "Pl.'s Dep."), at 60.) About a month later, in a conversation with Herrnreiter on June 21, 1995, Turrubiartes observed, "You know, you have a funny accent." (Plaintiff's Amended Complaint ¶ 15.) On November 1, 1995, Martin Melinger, CHA's Deputy Inspector General and Plaintiff's supervisor, told Plaintiff that he could not understand a word Plaintiff was saying and proceeded to use Jerial Howard, the OIG's Chief Investigator, as an interpreter. (Plaintiff's Local Rule 56.1(b)(3)(B) Statement of Additional Material Facts (hereinafter "Pl. St. of Add'l

Facts") ¶ 18.) Finally, Plaintiff asserts that on May 3, 1996, as he was in the process of moving from his cubicle in the auditing section of the OIG to a cubicle closer to investigations, Turrubiartes said to him, "Ahh. I know why you are moving. Sneaky." (Ex. 7 to Pl.'s Dep.) Plaintiff admits that being called "sneaky" does not have anything to do with his German heritage, but he did write a memorandum to Howard and Odom to complain about the comment, calling it "abusing and provoking." (Pl.'s 56.1 Response ¶ 82; Pl.'s Dep., at 119-20.)

In early 1996, Plaintiff was transferred within the OIG from his auditor position to the position of investigator. (Def.'s 56.1 St. ¶ 21.) According to CHA's personnel policies, employees who are transferred to another position within CHA are on probationary status for six months after their transfer is completed. (*Id.* ¶ 30.) An employee on probationary status can be terminated from his or her position for any reason. (*Id.*) When Plaintiff was first transferred to the position of investigator, he was the only white, foreign born investigator; all of the other investigators, including his supervisor, were African American. (Pl. St. of Add'l Facts ¶¶ 1.1, 1.3, 1.4).

According to Plaintiff, he was transferred to the investigator position in January of 1996 by Hubert Holton, the then outgoing Inspector General of CHA. (Plaintiff's Local Rule 56.1(b)(3)(A) Response to Defendant's 56.1(a)(3) Statement (hereinafter "Pl.'s 56.1 Response") ¶ 25.) According to Defendant, however, Holton had attempted to initiate Herrnreiter's transfer, but, as an outgoing supervisor, he did not have the authority to take personnel actions at that time. (Def.'s 56.1 Statement ¶ 25.) Instead, Defendant contends that Plaintiff was not transferred until March 1996, when Leonard

- 3 -

Odom replaced Hubert Holton as the Inspector General. (Def.'s 56.1 ¶¶ 10, 28.) At that time, Odom met with Joseph Shuldiner, the CHA's executive director. (*Id.* ¶ 25.) Shuldiner told Odom that Holton had attempted to initiate a lateral transfer of Herrnreiter.[1] (*Id.*) After meeting with Shuldiner, Odom conferred with Jeriel Howard, the OIG's Chief Investigator, to determine whether Herrnreiter should be transferred to investigations. (*Id.* ¶ 26.) Howard encouraged Odom to proceed with the transfer and assured Odom that he (Howard) would work closely with Herrnreiter to ensure that Herrnreiter learned to do investigations properly. (*Id.*) Based on Howard's assurances as well as Herrnreiter's educational background, Odom approved the transfer on March 27, 1996. (*Id.*) The paperwork documenting the transfer indicated that the change in position was a "lateral" change from a Grade 16 position to another Grade 16 position. (Ex. 3 to Odom Dep.)[2]

As with Plaintiff's transfer date, his performance as an investigator is also disputed. Both Odom and Howard were of the opinion that Plaintiff was capable of doing good work if he followed instructions. (Odom Dep., at 22, 36.) The CHA asserts, however, that on several occasions Plaintiff ignored specific instructions given to him by Odom and Howard. (Def.'s 56.1 St. ¶¶ 33-41.) This alleged failure to follow orders

---

[1]     The reasons for Holton's decision to transfer Herrnreiter are not apparent from the record. Nor is it clear why Holton did not have the authority to transfer Herrnreiter merely because Holton was an outgoing supervisor.

[2]     The document itself is of no help in determining when, in fact, Plaintiff was transferred because it is dated January 5, 1996 and is signed by Holton on that date, but then signed again at the bottom with Odom's initials beside the later date of March 27, 1996. (*Id.*)

resulted in Plaintiff's receiving a rating of "2" for "does not meet expectations" in the category of "communicates effectively and accurately in both verbal and written form" on his performance evaluation of July 31, 1996, despite his overall rating of 3.96 (out of 5), signifying that he performed "above expectations." (*Id.* ¶¶ 44-46; Pl.'s 56.1 Response ¶ 58.) Howard wrote and signed the evaluation as Herrnreiter's supervisor, while Odom concurred with Howard's evaluation and signed the evaluation on the line marked "concurrence." (Ex. 12 to Pl.'s Dep.) Odom then made the decision to transfer Plaintiff back to the audit division. (Def.'s 56.1 St. ¶ 42.)

For his part, Plaintiff denies that he failed to follow instructions when he was working as an investigator. (Pl.'s 56.1 Response ¶¶ 35-40.) Rather, Plaintiff argues that the low rating he received in the communications category of the evaluation was merely an excuse for transferring him back to the auditor position. (Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment (hereinafter "Pl.'s Memorandum"), at 6.) In support of this contention, Plaintiff points out that Howard presented no documents to support Plaintiff's grade of "2" on communication. (Pl.'s 56.1 Response ¶ 45.) Plaintiff also notes that he had received satisfactory ratings in communication skills in 5 prior performance reviews while he was a Senior Auditor. (*Id.* ¶ 51; Pl.'s St. of Add'l Facts ¶ 25.3.) Additionally, Plaintiff alleges that when he went to Odom's office to discuss the performance evaluation, Odom greeted him by saying, "Jawohl, what's up?"[3] (Def.'s 56.1 St. ¶ 85.) Plaintiff also

---

[3] "Jawohl" is German for "yes" or "indeed."

contends that Odom originally told him he was being reassigned not because he failed to follow instructions, but because he lacked a law enforcement background. (Pl.'s St. of Add'l Facts ¶ 45.) Finally, Plaintiff notes that when he was transferred back to his position of auditor, he was replaced by an African American man, Arthur White. (Pl.'s 56.1 Response ¶ 52.) He admits, however, that there are currently two white investigators, Thomas Hoffman and Berle Litman, both of whom were hired after he was transferred back to his position as auditor. (Id.)

Regardless of the reason for Plaintiff's transfer back to his former position, both parties agree that he was reassigned to the position of auditor on September 9, 1996, and that Odom made the decision to transfer him back. (Id. ¶¶ 42, 59.) According to Defendant, that transfer occurred within the six month probationary period for all newly transferred persons; according to Plaintiff, that period ended two months earlier. (Pl.'s St. Add'l Facts ¶ 11.)[4] Both agree that the reassignment did not involve a reduction in Plaintiff's pay. (Id. ¶ 43.) Plaintiff points out, however, that he did enjoy some additional benefits as an investigator – including a company car, more time spent in the field as opposed to the office, more freedom, independence, responsibility, higher status

---

[4]        Curiously, while both Plaintiff and Defendant agree that Plaintiff reported back to work as a Senior Auditor in September 1996, when he returned from vacation, both parties also agree that Odom and Howard actually signed Plaintiff's form to transfer him back on July 25, 1996. (See Pl.'s St. of Add'l Facts ¶ 47; Def.'s 56.1 Reply ¶ 47.) July 25, 1996 is clearly within the six month probationary period. Because neither asserts, however, that the transfer became effective on the date the form was signed, the court will assume it became effective on the date Plaintiff actually reported to work, September 9, 1996.

and a greater variety of jobs – which he had to relinquish when he went back to his position as an auditor. (Pl..'s 56.1 St. ¶¶ 24 (a) - (e), 43.)

Immediately after being reassigned to the auditor position, Plaintiff was told that his supervisor would be Martin Melinger, the Deputy Inspector General. (Def.'s 56.1 St. ¶ 62.) Shortly thereafter, however, Melinger informed Odom that Melinger was going to retire and the two men agreed that Turrubiartes should supervise Herrnreiter. (Odom Dep., at 56-67.)

Upon his return to auditor, Turrubiartes assigned Herrnreiter the task of reviewing each audit issued by the OIG in the first eight months of 1996. (Ex. 18 to Pl.'s Dep.) Turrubiartes was not satisfied with Herrnreiter's initial progress on the project, and, on September 30, 1996, Turrubiartes told Herrnreiter that Herrnreiter was probably a week behind schedule. (Pl.'s Dep., at 197-98.) Herrnreiter admits that he was probably seven days behind schedule but alleges that Turrubiartes' deadline for the project was unrealistically truncated. (Pl.'s 56.1 Response ¶¶ 67-68.)

As a result of falling behind schedule on the project, Plaintiff was placed on a thirty-day Corrective Action Plan (hereinafter "CAP") on October 2, 1996. (Def.'s 56.1 St. ¶ 69.) The plan was written by Turrubiartes at Odom's suggestion and approved by Odom. (Id.) According to the CAP, Herrnreiter had failed to properly perform several steps of the follow up audit project. (Id. ¶ 71.) Specifically, the project required Herrnreiter to develop a general audit program that would serve as a guide and also to develop specific audit programs to determine the status of each of the OIG's prior audit recommendations. (Id.) The CAP explained that Herrnreiter had taken far too long to

draft both the general audit program and each specific program. (*Id.* ¶ 72.) For instance, Turrubiartes noted that, although Herrnreiter had been given a full week in which to develop five specific audit programs, only one of them had been completed in that time. (Ex. 22 to Pl.'s Dep., at 1.) Further, Turrubiartes noted that Herrnreiter's specific audit programs were improperly drafted because they did not allow Herrnreiter to verify that the CHA programs being audited had instituted the OIG's prior audit recommendations. (Def.'s 56.1 St. ¶ 72.) Moreover, the CAP criticized Herrnreiter's performance in conducting several individual audits on grounds that Herrnreiter had failed to ask auditees appropriate questions and had failed to document his discussions with auditees completely and accurately. (*Id.*) For example, Turrubiartes noted in the CAP that, after being instructed to perform three follow-up audits concerning insurance policy matters, Herrnreiter had neglected to ask questions that were necessary to determining whether recommendations in the initial audit report had actually been implemented. (Ex. 22 to Pl.'s Dep., at 3-4.) Furthermore, Turrubiartes claimed that Herrnreiter had failed to take adequate notes at the meeting. (*Id.*) On October 8, 1996, Turrubiartes memorialized his dissatisfaction with Herrnreiter's performance in a memorandum detailing several of these task that Herrnreiter had failed to complete. (Ex. 32 to Pl.'s Dep.)

Plaintiff claims, however, that the CAP was a "sham" utilized by Defendant to facilitate his termination and that similarly situated black employees were not terminated despite equal or worse performance. (Pl.'s 56.1 Response ¶¶ 69-74.) He also claims that his CAP assignment, preparing audit programs, was "out of the ordinary,"

since this work had always been reserved for the audit supervisor or manager. (Pl.'s 56.1 St. of Add'l Facts ¶ 36.6.) Defendant disputes Plaintiff's characterization of the CAP, contending it is based solely on his own opinion, and further points out that Plaintiff himself testified that "he was trained and qualified to prepare an audit program." (Def.'s 56.1 Reply ¶ 36.6)

After Herrnreiter was placed on the CAP, he submitted three successive drafts of a follow up audit report on the cancellation of certain life insurance policies, all of which were reviewed by Turrubiartes and returned to Herrnreiter with handwritten comments and editorial suggestions. (Exs. 29-31 to Pl.'s Dep.) On each draft, Turrubiartes wrote that Herrnreiter had improperly relied on an "assurance" from an auditee that a correction was being implemented. (*Id.*) For instance, at the top of the first draft that Turrubiartes returned to Herrnreiter, Turrubiartes wrote:

> How can you [Herrnreiter] as an auditor rely on verbal 'assurances' by anyone as the basis for saying whether something is right, proper, correct, or not? We are not in the business of accepting 'assurances.' Quite the contrary, we are in the business of verifying, confirming, validating, etc., data in a manner [that] ensures and assures [sic] the facts.

(Ex.. 29 to Pl.'s Dep.) Herrnreiter's subsequent drafts also proved unacceptable to Turrubiartes, and Herrnreiter's inadequate work on the assignment culminated in an exasperated Turrubiartes marking up the third and final draft with comments like "No further drafts will be requested of Siegfried because there has been little if any improvement" and "Siegfried: I am not your proofreader." (Ex. 31 to Pl.'s Dep.) At his deposition, Herrnreiter agreed that the third draft "probably [was] not acceptable" and that he "probably gave up at that point." (Pl.'s Dep., at 295.)

Similarly, on October 7, 1996, Turrubiartes instructed Herrnreiter to meet with an employee in the CHA's risk management department to discuss a related issue on insurance policies. (Ex. 32 to Pl.'s Dep.) Herrnreiter failed to meet with the employee and explained to Turrubiartes that he had forgotten to do so. (*Id.*) With regard to this assignment, Herrnreiter stated that it is "possible that I maybe didn't cover this in the fashion Mr. Turrubiartes expected." (Pl.'s Dep., at 306-07.)

On October 10, 1996, Odom instructed Turrubiartes to confer with the CHA's human resource department on whether CHA was required to give Herrnreiter the full thirty days to comply with the CAP. (Def.'s 56.1 St. ¶ 79.) Both Odom and Turrubiartes concluded that Herrnreiter was not making a good faith effort to satisfy the CAP. (Odom Dep., at 212-13.) Armetta Reed of the human resource department informed Turrubiartes and Odom that Herrnreiter could be terminated from his job before the thirty days had elapsed if Herrnreiter was not making a good faith effort to fulfill the requirements of the CAP. (*Id.*, at 231.) Armed with this information, Odom made the decision to terminate Herrnreiter's employment on October 25, 1996. (Def.'s 56.1 St. ¶ 79.)

## DISCUSSION

I.    **Summary Judgment Standard in Employment Cases**

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Flores v. Preferred Tech.*

*Group*, 182 F.3d 512, 514 (7th Cir. 1999). A party opposing summary judgment must do more than raise "metaphysical doubt" about the presence of a genuine issue of material fact. *Miranda v. Wisconsin Power & Light Co.*, 91 F.3d 1011, 1016 (7th Cir. 1996). The non-moving party must demonstrate through specific factual allegations that there is a genuine issue of material fact that requires a trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). With this standard in mind, the court will analyze CHA's motion for summary judgment on Herrnreiter's claim of harassment based on national origin, his claims of race and national origin discrimination, and his retaliation claim.

## II.     Harassment Based on National Origin

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . national origin." 42 U.S.C. § 2000e-2(a)(1). This language is not limited to economic or tangible discrimination. *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993). Discrimination with respect to "terms, conditions, or privileges of employment" includes requiring people to work in a discriminatorily hostile or abusive work environment. *Id.* A hostile work environment exists when the conduct at issue has the purpose or effect of "unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment." *Filipovic v. K & R Express Sys., Inc.*, 176 F.3d 390, 397 (7th Cir. 1999) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)).

Not all unpleasant working conditions meet the test, however. "[R]elatively isolated instances of nonsevere misconduct will not support a claim of a hostile

environment." *Ngeunjuntr v. Metro. Life Ins. Co.*, 146 F.3d 464, 467 (7th Cir. 1998). Rather, Title VII protects a worker against conduct that is sufficiently severe or pervasive that a reasonable person would find it hostile and that the victim himself subjectively sees as hostile. *Id.* Whether an objectively hostile environment exists is a question of law. *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 345 (7th Cir. 1999). The factors to be considered include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

For example, in *Filipovic v. K & R Express Sys.*, 176 F.3d 390, 392 (7th Cir. 1999), plaintiff Filipovic alleged that he was subjected to discrimination and harassment based upon his national origin. Specifically, Filipovic, who was originally from Yugoslavia, alleged that some of his co-workers and supervisors called him names such as "fucking foreigner" and "Russian dick head," and that one supervisor commented, with respect to the civil war in Yugoslavia, that "it seems to me all Serbians are barbarians." *Id.* at 393. The court, considering only those comments that occurred within the relevant statutory time frame, concluded that there were four such national origin-related comments made over the course of more than a year. *Id.* at 398. In holding that Filipovic had not established a hostile work environment claim, the court pointed out that, though Plaintiff had shown the comments were made "because of" his national origin, the comments were few in number, were not physically threatening, were spread out over more than a year, and were relatively mild. *Id.* Thus, the court determined

that such comments were more akin to the "relatively isolated instances of nonsevere misconduct" that do not constitute a hostile work environment. *Id.*

Similarly, Herrnreiter has not alleged conduct either severe or pervasive enough to constitute an objectively hostile work environment. Herrnreiter's hostile work environment claim rests on the following five alleged acts of harassment based on his German national origin:

(1) April 7, 1995—Turrubiartes, while speaking to Rodriguez, purportedly referred to naturalized citizens as "foreigners" and said that he did not want to hire them because he did not want to end up "with another Siegfried [Herrnreiter] or Virma [Rodriguez]." (Def.'s 56.1 St. ¶ 19.)

(2) June 21, 1995—Turrubiartes told Herrnreiter that he had "a funny accent." (*Id.* ¶ 20.)

(3) November 1, 1995 – Melinger, Plaintiff's supervisor at the time, told Plaintiff that he could not understand him and proceeded to use Howard as an interpreter. (Pl.'s St. of Add'l Facts ¶ 18.)

(4) May 3, 1996—Turrubiartes called Herrnreiter "sneaky." (*Id.* ¶ 81.)

(5) August 16, 1996—Odom greeted Herrnreiter in German by saying, "Jawohl." (*Id.* ¶ 85.)[5]

---

[5] In the Evidentiary Materials in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Herrnreiter included an affidavit from himself alleging that, in addition to the four comments set forth above, on at least five occasions, Odom directed statements at Herrnreiter like "don't act like Hitler" and "you are parading around like Hitler." (Pl.'s Aff. ¶ 3, Ex. 6 to Evidentiary Materials in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment.) The allegations in Herrnreiter's affidavit concerning remarks about Hitler made by Odom directly contradict testimony Herrnreiter gave in his deposition. In his deposition, Herrnreiter testified as follows concerning his interrogatory answer:

Q. You also wrote in your answer that Odom made disparaging remarks towards you. Are these the Jawohl remarks?

A. Yes, sir. That's correct. He made these remarks several times.

Q. Were there any other remarks that were disparaging?

A. To me they are disparaging because—

Q. Were there any other remarks that he made that were disparaging of

(continued...)

As with the comments made to Filipovic, the comments made to Herrnreiter were made over more than a year: in his case, eighteen months. Five incidents over such an extended duration are insufficient to constitute actionable harassment. Additionally, the comments set forth above were not *severe* enough to constitute actionable harassment. Herrnreiter himself did not hear the first comment and offers only hearsay evidence that such a comment was even made. As to Turrubiartes "sneaky" comment, Herrnreiter admitted that the comment did not relate to his national origin, nor can this court understand how such a comment could be construed in such a way. *See* Pl.'s 56.1 Response ¶¶ 82, 83. The last three comments (use of "Jawohl" and references to Plaintiff's accent) are arguably related to Herrnreiter's national origin, but, like the comments lodged against Filipovic, they were relatively mild, were not physically threatening, and could not be said to unreasonably interfere with Herrnreiter's work performance. Accordingly, CHA's motion for summary judgment on the harassment claim is granted.

---

[5](...continued)
your National origin?
A. No. *These were the only remarks he made*, but they have the same effect.
(Pl.'s Dep., at 399) (emphasis added). A party cannot effectively oppose a motion for summary judgment by contradicting his own deposition testimony. *Piscione v. Ernst & Young, LLP*, 171 F.3d 527, 532 (7th Cir. 1999). Frequent references and comparisons of Herrnreiter to Hitler would be extremely offensive and might well support a hostile work environment claim. Had such offensive comments in fact been made, the court expects Herrnreiter would have had no difficulty remembering them and recounting them when asked at his deposition for examples of Odom's improper comments. Herrnreiter offers no explanation for a purported memory lapse, and therefore the statements in his affidavit that contradict testimony he gave in his deposition will be ignored.

## III.    Discrimination Based on Race and National Origin

In addition to his harassment claim, Herrnreiter contends his managers discriminated against him based on his race and national origin when they transferred him back to the auditor position and, later, terminated him. A plaintiff can prove a claim of race discrimination or national origin discrimination under Title VII by offering direct evidence of discriminatory intent or by proceeding under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). In opposing CHA's motion for summary judgment, Herrnreiter has chosen to proceed under the latter paradigm. To survive a motion for summary judgment under *McDonnell Douglas*, Herrnreiter must first establish a *prima facie* case of discrimination by producing evidence that tends to show that: (1) he is a member of a protected class; (2) he performed his job satisfactorily; (3) he suffered a materially adverse employment action; and (4) he was treated less favorably than similarly-situated employees outside of his protected class. *Gonzalez v. Ingersoll Mill. Mach. Co.*, 133 F.3d 1025, 1032 (7th Cir. 1998). If Herrnreiter can establish a *prima facie* case, the burden then shifts to CHA to establish a legitimate, nondiscriminatory reason for the adverse employment action. *See Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 684 (7th Cir. 2000). If CHA does so, Herrnreiter must come forward with evidence that indicates that CHA's stated reason for the action was merely a pretext for unlawful discrimination. *Id.*

### A.    Herrnreiter's Reassignment

Herrnreiter cannot establish a *prima facie* case of intentional race or national origin discrimination stemming from his reassignment to auditor because he cannot

show that the reassignment to auditor was a materially adverse employment action. A materially adverse action occurs when an employee is "fired or demoted, suffers a decrease in benefits or pay, or is given a significantly lesser job." *Hill v. Am. Gen. Fin., Inc.*, 224 F.3d 681, 645. A purely lateral transfer does not constitute a materially adverse employment action. *Williams v. Bristol-Meyers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996). Furthermore, a plaintiff's own perceptions regarding the prestige of a position are insufficient, absent other evidence, to establish a materially adverse employment action. *Flaherty v. Gas Research Inst.*, 31 F.3d 451, 457 (7th Cir. 1994).

In Herrnreiter's case, his reassignment did not involve a decrease in pay. (Def.'s 56.1 St. ¶ 43.) Furthermore, all of the paperwork documenting his initial transfer from auditor to investigator indicates that the transfer was purely a lateral one. (Ex. 3 to Odom Dep.) In support of his contention that the reassignment was in fact a materially adverse job action, Herrnreiter offers only his opinion that the investigator position was more desirable than the auditor position because it included more time spent in the field as opposed to the office, more freedom and independence, more responsibility and variety, a higher status, and a company car. At his deposition, for instance, Herrnreiter testified as follows:

> Q.   Do you consider the investigator job an advancement?
> A.   It was an advancement for me.
> Q.   Why?
> A.   Since I love to work with people, I love to do investigations, I know I was competent doing it, and I also had the results . . . . I enjoyed also working with a team of professionals, and I think they knew what they were doing, and I really enjoyed being a part of it.
> Q.   Is the investigator position a promotion over your senior auditor position?

A.   Not otherwise, but I enjoyed working on cases which were of short duration; yet, still important that they had to be done and I think this was one of the reasons why I was so successful because I enjoyed what I was doing.

(Pl.'s Dep., at 405-06) (emphasis added). According to Herrnreiter's testimony, his reassignment to auditor was a demotion simply because he found the investigator position more enjoyable. Such subjective perceptions regarding the status of a position will not suffice to establish a materially adverse job action.[6] Accordingly, the court concludes that Herrnreiter cannot establish a *prima facie* case of discrimination in his reassignment to auditor because that reassignment was not a materially adverse job action.

Even if Herrnreiter were able to establish a *prima facie* case of discrimination, his claim would nonetheless founder due to his failure to provide evidence from which a reasonable jury could conclude that CHA's reason for reassigning him was pretextual. According to CHA, at the time Herrnreiter was transferred back, he was on probationary status for the investigator position and could be terminated for any (legal) reason. Even accepting Herrnreiter's contention, however, that he was transferred to the position in January of 1996 and was, therefore, not on any such probationary status, CHA has presented a facially nondiscriminatory reason for reassigning Herrnreiter: namely, that

---

[6]   The only tangible benefit of the investigator position seems to be that Herrnreiter was, as an investigator, entitled to a company car. What little case law exists on the subject, however, suggest that Herrnreiter's loss of a vehicle, without more, would not be sufficient to render the reassignment actionable. *Cf. Von Gunten v. Maryland*, 243 F.3d 858, 867 (4th Cir. 2001) (holding that employer's temporary withdrawal of employee's state-owned vehicle was not an adverse employment action for purposes of Title VII).

Herrnreiter repeatedly failed to follow instructions when he was an investigator. (Def.'s 56.1 St. ¶ 32.) The burden therefore shifts to Herrnreiter to produce evidence from which a jury could find that this legitimate reason offered by CHA was not its true reason but rather a pretext for discrimination.

A pretext is "a lie or a phony reason for an employment decision." *Baron v. City of Highland Park*, 195 F.3d 333, 341 (7th Cir. 1999). The issue of pretext "does not address the correctness or desirability of reasons offered for employment decisions. Rather, it addresses the issue of whether the employer honestly believes in the reasons it offers." *McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368, 373 (7th Cir. 1992). In reviewing CHA's decision to reassign Herrnreiter to auditor, this court will not act as a "super-personnel department," reevaluating Herrnreiter's performance, but will ask only whether CHA honestly believed its proffered reasons for transferring Herrnreiter. *Ghosh v. Indiana Dep't of Envtl. Mgmt.*, 192 F.3d 1087, 1093 (7th Cir. 1999).

In assessing whether Herrnreiter can demonstrate pretext, the court must also consider the inference of nondiscrimination that arises in circumstances such as this, in which Herrnreiter was transferred and then reassigned by the same person (Odom) within a short period of time. Such facts give rise to the "common actor" presumption of nondiscrimination—that is, the presumption that a person who hires an individual of a particular protected class (in this case, a person of German origin) would not get rid of the same employee as a result of a sudden aversion to persons that group. *See Roberts v. Separators, Inc.*, 172 F.3d 448, 452 (7th Cir. 1999) (applying the "common actor" presumption to affirm summary judgment in age discrimination case). Although

the presumption is not irrebuttable, it does create a "strong inference" that discrimination was not the motivating factor. *Id.* at 452. Here, the court finds it unlikely that Odom, who approved Herrnreiter's initial transfer to investigator in March 1996, would develop a distaste for Herrnreiter's race and national origin only five months later.[7] Keeping this inference in mind, the court reviews Herrnreiter's evidence of pretext.

In response to CHA's stated reason that Herrnreiter was reassigned because he failed to follow instructions, Herrnreiter points out that at the time he was reassigned, Odom told him the reason was that he lacked a law enforcement background. (Plaintiff's Memorandum, at 7.) Herrnreiter contends that these inconsistent reasons given by CHA for his reassignment are sufficient to establish pretext. (*Id.*) The court notes, however, that both of the two reasons are legitimate and nondiscriminatory. Nor is it readily apparent that the two stated reasons Herrnreiter characterizes as inconsistent for Herrnreiter's reassignment are even inconsistent. According to Odom, Herrnreiter's lack of law enforcement training accentuated the need for him to follow instructions when he was transferred to investigations. (Odom's Dep., at 36-39.) In other words, the two reasons are not materially different, and CHA's reason for reassigning Herrnreiter to auditor was not a pretext for discrimination based on race or national origin. CHA's

---

[7] Herrnreiter argues that his transfer was in fact authorized by Holton and not Odom. It is undisputed, however, that Odom also approved of the transfer in March of 1996. Whether that approval made Herrnreiter's transfer official, as CHA claims, or not, the "common actor" presumption is still valid here because Odom's approval in March still raises a presumption that he did not have any problem allowing Herrnreiter to take the position.

motion for summary judgment on Herrnreiter's claims of race discrimination and national origin discrimination arising out of Herrnreiter's reassignment to auditor is granted because Herrnreiter cannot establish a *prima facie* case of discrimination and because CHA's reason for the reassignment was not pretextual.

## B. Herrnreiter's Termination

Under *McDonnell Douglas*, Herrnreiter cannot establish a *prima facie* case of intentional race discrimination or national origin discrimination arising out of the termination of his employment because he cannot show that he was meeting the legitimate expectations of the CHA at the time of his termination. Herrnreiter concedes that in September 1996 Turrubiartes gave him a significant audit assignment and that he failed to perform the assignment adequately. (Pl.'s 56.1 Response ¶¶ 64-67.) In his deposition, for example, Herrnreiter testified as follows concerning his failure to perform the audit assignment on time:

> Q. When [Turrubiartes] told you that you were seven days behind schedule, was that true?
> A. I do not know.
> Q. Were you behind schedule?
> A. Probably his schedule, probably. I do not know. I would assume yes. I don't think he made that up.

(Pl.'s Dep., at 198-99.)

Herrnreiter also concedes that, as a result of his failure to complete the audit, he was placed on a CAP and that he failed to meet several of the requirements of the CAP. (Pl.'s 56.1 Response ¶¶ 69-70, 80.) When presented in his deposition with a detailed list

of the ways in which he had failed to perform the requirements of his CAP, Herrnreiter either acknowledged shortcomings or simply offered no response:

> Q. According to Mr. Turrubiartes you failed to meet the CAP's requirements that you conduct proper audit research. Did you fail to meet that requirement?
>
> A. Probably I failed to meet the requirement.
>
> Q. On the second notch according to [Turrubiartes's] memorandum you failed to meet OIG and CAP requirements to document audit work in accordance with established OIG standards. Did you fail to meet those requirements?
>
> A. I don't remember.
>
> Q. And then down below there's four more things that you supposedly failed to do. The first is to meet the CAP deadline for completing the required comparative analysis between the Transamerica insurance policy and the Royal Macabees insurance policy. Did you fail to meet that deadline?
>
> A. It is very possible, but I would like to emphasize that these are all subjective deadlines which were established by Mr. Turrubiartes in his mind.
>
>                                  \*\*\*
>
> Q On the second thing down below [Turrubiartes] said that you failed to meet the CAP deadline for providing data pertaining to why the Royal Macabees policy was not reinstated. Did you fail to meet that deadline?
>
> A. I don't remember.
>
> Q. The third thing is [Turrubiartes] said that you failed to meet the CAP deadline for submitting the required draft report. Did you fail to meet that deadline?
>
> A. It is possible. Again, all the deadlines he's talking about [are] subjective deadline[s] which he just grasped out of the air.
>
> Q. The next question·is on [Turrubiartes's] fourth item below he said that you failed to meet the CAP audit research requirement to obtain the old Royal Macabees insurance policy...Did you fail to meet that requirement?
>
> A. It is possible.

(Pl.'s Dep., at 348-50.) Herrnreiter's only response to these facts is that the CAP was a "sham" designed to facilitate his termination. (Pl.'s 56.1 Response ¶ 80.) Nowhere in his brief or statement of facts, however, does Herrnreiter attempt to explain exactly how,

as a matter of fact, the CAP was a sham. Instead, he makes unsupported allegations that the CAP was more complex than those given to black employees. (Pl. St. of Add'l Facts ¶ 36.3.) For example, Herrnreiter lists three black employees at the OIG—Norman Irvin, Eric French, and Arthur White—all of whom were allowed to finish their CAPs. (*Id.* ¶ 36.2.) After identifying these employees, however, Herrnreiter sets forth no specific evidence to demonstrate that his own CAP was more complicated than the CAPs of the aforementioned three employees. Herrnreiter's theory that black workers at the OIG were given less demanding CAPs is based entirely on his own suppositions.

Herrnreiter also contends that the conditions of the CAP were "subjective," and that the CAP was designed with extra "hurdles" for him to overcome. (*Id.* ¶¶ 36.4.) For instance, Herrnreiter alleges that the audit assignment that formed the basis of the CAP, a project that required him to review each audit issued by the CHA in the first eight months of 1996, was itself unfair. (*Id.* ¶ 36.6.) Herrnreiter asserts that the project was "out of the ordinary" because he was required to prepare the audit program itself. (*Id.*) Disappointingly, CHA has not bothered to explain the purpose of this assignment. Nevertheless, Herrnreiter testified at his deposition that he was trained and qualified to prepare audit programs. (Pl.'s Dep., at 62-65.) Herrnreiter's theory that the CAP was a mere pretense for terminating his employment consists mainly of speculation and surmise. A demonstration that one was meeting an employer's legitimate expectations requires more than these elements. Accordingly, the court must conclude that Herrnreiter fails in his attempt to establish a *prima facie* case of discrimination because

he was not meeting the legitimate expectations of the CHA at the time of the termination.

Even if Herrnreiter were able to establish a *prima facie* case of race discrimination and national origin discrimination resulting from the termination of his employment, his claim would still fail because he cannot prove that the CHA's reason for terminating him was pretextual. Herrnreiter contends that the CHA's reason for terminating his employment was pretextual because black employees placed on CAPs were treated differently and because the CHA violated its own personnel policies in terminating him. Herrnreiter has not set forth credible evidence to support either of these theories, however. With respect to the CAP, Herrnreiter first claims that, while black employees in the OIG were allowed to complete their CAPs, he was terminated before the end of his CAP period. (Plaintiff's Memorandum, at 10.) Herrnreiter acknowledges, however, that he "probably gave up" while he was on the CAP. (Pl.'s Dep., at 295.) Herrnreiter therefore cannot reasonably contest Odom's decision to terminate his employment before the expiration of the thirty-day CAP period because he admittedly was not making a good faith effort to satisfy the CAP's requirements. Herrnreiter also contends that his CAP was more arduous than the CAPs given black employees and that the scope of his CAP was increased during the CAP period, but the only items of evidence he offers in support of these contentions are paragraphs 36.3 and 36.4 of his own statement of additional facts, which themselves cite only the original CAP document. (Plaintiff's Memorandum, at 10, citing Pl. St. of Add'l Facts ¶¶ 36.3, 36.4.) The court is unable to comprehend how the original CAP document itself supports the argument that

Herrnreiter's CAP was more demanding than CAPs given to black employees, or the argument that the scope of Herrnreiter's CAP was increased during the CAP period.

Nor is the court moved by Herrnreiter's contention that pretext is shown here by the CHA's violation of its own personnel policies in dismissing him. Herrnreiter alleges that Turrubiartes wrote four written reprimands of Herrnreiter but failed to follow the CHA's reprimand policy, which requires a supervisor to present written reprimands to the concerned employee. (Pl. St. of Add'l Facts ¶ 36.) As Turrubiartes testified at his deposition, however, the reason Herrnreiter never received the memoranda was that Turrubiartes did not intend them to be reprimands, but instead intended merely to document Herrnreiter's poor performance. (Turrubiartes Dep., at 51-67.) In this court's view, failure to advise an employee of his deficiencies is unwise. Herrnreiter does not suggest he was unaware of Turrubiartes concerns, however, and a review of the comments made concerning Herrnreiter's work product demonstrates that he was, in fact, on notice. After considering the entire record, the court concludes that Plaintiff has not presented evidence that creates a dispute of material fact concerning the legitimacy of CHA's reason for terminating Herrnreiter's employment. CHA's motion for summary judgment on Herrnreiter's claims of race discrimination and national origin discrimination arising out of the termination of Herrnreiter's employment is granted.

## IV. Retaliation

In Count IV of his Amended Complaint, Herrnreiter asserts a claim for retaliation under Title VII. To establish a prima facie case of retaliation, Herrnreiter must show that: (1) he engaged in protected activity; (2) he suffered an adverse job action; and (3)

there is a causal link between the protected activity and the adverse job action. *See Krause v. City of LaCrosse*, 246 F.3d 995, 1000 (7th Cir. 2001). CHA contends, and the court agrees, that Herrnreiter's retaliation claim must fail because he has not shown that he engaged in any statutorily protected activity.

To qualify as protected activity under Title VII, an employee must oppose an unlawful employment practice. *See* 42 U.S.C. § 2000e-3(a); *Reed v. Shephard*, 939 F.2d 484, 492-93 (7th Cir. 1991). Herrnreiter's retaliation claim is based solely on his contention that in June of 1996 he complained to Odom about being called "sneaky" by Turrubiartes. Several months later he was transferred back to his position as auditor and then terminated from that position. As has already been stated, however, Herrnreiter himself admits that being called sneaky had nothing to do with his German national origin. (Pl.'s 56.1 Response ¶ 82; Pl's Dep., at 119-20 .) Thus, Herrnreiter did not engage in a statutorily protected activity when he reported the incident to Odom. In any event, in his brief in opposition to CHA's motion for summary judgment, Herrnreiter makes no mention of his retaliation claim. For these reasons, the court grants CHA's motion for summary judgment on the retaliation claim.

## CONCLUSION

Herrnreiter's harassment claim based on his German national origin fails because he cannot show that he suffered an objectively hostile work environment. Herrnreiter's discrimination claims based on race and national origin falter because Herrnreiter cannot show that his reassignment to auditor was a materially adverse employment action and that he was meeting the CHA's legitimate expectations when his employment

was terminated. Furthermore, neither the CHA's reason for reassigning Herrnreiter to auditor nor the CHA's reason for terminating Herrnreiter was pretextual. Herrnreiter has abandoned his retaliation claim. For these reasons, CHA's motion for summary judgment (Doc. No. 73-1) is granted on Counts I-IV.

ENTER:

Dated: July 30, 2001

REBECCA R. PALLMEYER
United States District Judge